UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| NIKKO TALLEY, | * | |
| Plaintiff, | * | |
| v. | * | Case No. 1:21-cv-00347-JRR |
| ANNE ARUNDEL COUNTY, MD, *et al.*, | * | |
| Defendants. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## <u>MEMORANDUM OPINION</u>

This matter comes before the court on Defendants Cpl. Jason DiPietro #1249, Sgt. Kelly M. Harding #1309 (together, the "Individual Defendants"), and Anne Arundel County, Maryland's (the "County") Motion for Summary Judgment. (ECF No. 49; the "Motion.") The parties' submissions have been reviewed and no hearing is necessary. Local Rule 105.6 (D. Md. 2023). For the reasons that follow, by accompanying order, the Motion will be granted.

## BACKGROUND

This action arises out of the alleged malicious prosecution of Plaintiff. According to Plaintiff, on November 16, 2016, he was arrested for the murder of Trayvon Briscoe — a crime he did not commit and for which he was incarcerated for over a year while awaiting trial. (ECF No. 13, ¶ 1-2.) Plaintiff alleges that Defendants withheld evidence from judicial officers and prosecutors resulting in his prosecution. *Id.* ¶ 2. On January 29, 2021, Plaintiff filed his original complaint in the Circuit Court for Anne Arundel County. Defendants removed the case to this court on the basis of federal question jurisdiction under 28 U.S.C. § 1331. (ECF No. 1, ¶ 4.) On March 12, 2021, Plaintiff filed his Amended Complaint (the "Complaint") asserting seven causes

of action: 42 U.S.C. § 1983 Fourth Amendment Malicious Prosecution against the Individual Defendants (Count I); 42 U.S.C. § 1983 Fourteenth Amendment Malicious Prosecution against the Individual Defendants (Count II); Maryland Declaration of Rights Malicious Prosecution against all Defendants (Count III); Common Law Malicious Prosecution against all Defendants (Count IV); Negligent Training Supervision & Retention Resulting in Malicious Prosecution against the County and Defendant Altomare (Count V); *Monell* Claim for a Pattern or Practice of 4th and 14th Amendment Malicious Prosecution (Count VI); *Longtin*-type Claim for a Pattern or Practice of Article 24 and 26 Malicious Prosecution (Count VII).  (ECF No. 13).

Defendants Harding, DiPietro, and Timothy Altomare and the County filed motions to dismiss Plaintiff's Complaint.  (ECF Nos. 14 and 15.)  Both motions were granted in part and denied in part by the Honorable Judge Richard Bennett of this court.  (ECF No. 23.)  With respect to the individual Defendants' motion (ECF No. 14), Judge Bennett dismissed all claims with prejudice against Defendant Altomare and allowed Counts I through IV to proceed against Defendants Harding and DiPietro in their individual capacities.  (ECF No. 22 at 2.)  With respect the motion filed by the County (ECF No. 15), Judge Bennett dismissed Counts IV-VII with prejudice and allowed Count III to proceed against the County.  The parties have since engaged in discovery.  Now that discovery has closed, Defendants move for summary judgment on Plaintiff's remaining claims.

## UNDISPUTED MATERIAL FACTS

### November 4, 2016 Shooting

On November 4, 2016, the Anne Arundel County Police Department responded to complaints of a shooting near the intersection of West Hilltop Road and Levin Road in Brooklyn Park, Maryland.  (Defs.' Mot., Exhibit 1—Criminal Investigation Report, ECF No. 49-2 at 2.)

Upon arrival at the scene, officers located a gunshot victim, later identified as Trayvon Briscoe; Briscoe was determined to be deceased at the scene. *Id.* On November 5, 2016, following an autopsy, the medical examiner ruled that Briscoe's death was homicide by gunfire. *Id.* Briscoe had been shot three times. *Id.* Three .380 caliber automatic handgun shell casings, fired from the same gun, were found at the scene of the crime. (Crim. Inv. Report at 11.)

Attorneys from the Office of the State's Attorney responded to the scene and stayed assigned to the case from the night of the homicide through the jury trial in 2018. (Defs.' Mot., Exhibit 2, Det. Daniel Myers Dep., ECF No. 49-3 253:7-254:15.) Det. Daniel Myers was the lead detective on the case and the point of contact for the State's Attorney. *Id.* at 254:16-18.

**Scene Investigation**

On the night of the shooting, several police units responded to the scene and canvassed the surrounding area for potential witnesses and suspects. (Crim. Inv. Report at 4.) Witnesses reported hearing multiple gunshots and then seeing Briscoe running some distance before he ultimately collapsed. *Id.* Additionally, several residents in the surrounding area reported hearing gunshots and then hearing a vehicle speed away. *Id.* at 5.

During the initial canvass of the scene, Cpl. Joshua Giunta #1715 had a conversation with Jordan Fisher who claimed to have witnessed the shooting. Specifically, Fisher reported that he observed someone wearing "a grey hooded sweatshirt" put a black mask over his face and proceed toward the Levin Road intersection. (Pl.'s Opp'n, Exhibit B—Cpl. Joshua Giunta Report, ECF No. 56-3 at 1.) According to Fisher, a few moments later, he heard gunshots and saw the same subject run past him carrying a silver automatic handgun in his right hand. *Id.* at 2. Fisher described the subject as a black male in his late teens or early 20's, approximately five feet, eight

inches in height, with a medium build, and short black hair.  *Id.*  Cpl. Giunta documented his interaction with Fisher in a police report, and Fisher was released from the scene.  *Id.*

During the investigation of the scene, officers located a residence with a surveillance camera facing the alley.  (Crim. Inv. Report at 12.)  The surveillance footage revealed a black male subject, later identified as Plaintiff, wearing grey clothing and a black mask running through the alley, as described by Fisher.  *Id.*

**<u>Neighborhood Investigation</u>**

On November 5, 2016, several detectives conducted a canvass of the residences around the general area where Briscoe was murdered.  (Crim. Inv. Report at 8.)  Detective Sweeney #1628 located a resident who had surveillance footage.  *Id.*  While at the residence, Det. Sweeney reviewed the surveillance, which showed a white car enter into the camera frame and pause at an intersection before driving off camera; several minutes later, three black male subjects are shown walking together for some distance until they parted ways.  *Id.*

During the neighborhood investigation, Det. Vincent Carbonaro #1749 was inside Daddy Pa's – a convenience store and common neighborhood hangout spot.  *Id.*  While in Daddy Pa's, Det. Carbonaro noticed a subject inside the store wearing a grey hooded sweatshirt with a black piece of clothing tucked into the collar, grey sweatpants, and white shoes.  (Crim. Inv. Report at 9.)  Upon noticing Det. Carbonaro, the subject quickly left the store; Det. Carbonaro attempted to follow the subject but could not find him.  *Id.*  Det. Carbonaro asked a person in the parking lot of the store if he had seen the subject wearing the grey sweat suit; the person informed the detective that he had seen the subject and the subject's street name was "Pocket."  *Id.*

On November 7, 2016, Det. Myers and Det. Carbonaro interviewed Fisher.  (Crim. Inv. Report at 10.)  Based on the investigation report summary by Det. Myers, Fisher's narrative was

consistent with the information he provided to Cpl. Giunta the night of the shooting. *Id.* Additionally, Fisher was shown a photographic lineup, which included a photo of a different suspect than Plaintiff for Briscoe's murder but did not positively identify any of the individuals in the photographs. *Id.*

**Arrest and Interviews of Plaintiff**

On November 10, 2016, Plaintiff was interviewed for the first time by Defendants DiPietro and Harding. Plaintiff's mother had contacted Det. DiPietro to set up a meeting among detectives and her son; she attended the November 10 interview with Plaintiff. (Crim. Inv. Report at 12.) During the interview, Plaintiff advised detectives that on the night of the shooting he was with Briscoe; as they were walking back from Daddy Pa's, he and Briscoe noticed a black male exit a vehicle and approach them while putting a mask over his face. *Id.* Plaintiff further indicated that he instructed Briscoe to run when he noticed the male exit the vehicle, but Briscoe did not run; but Plaintiff ran down an alley. Plaintiff informed the detectives that once he reached the top of the alley, he turned, heard gunshots, and continued running until he reached his girlfriend's house. *Id.* at 13. Plaintiff claimed he did not find out Briscoe was deceased until sometime later. *Id.* Detectives showed Plaintiff still images of the video surveillance collected in connection with the investigation, and Plaintiff identified himself as the individual in those images wearing the grey sweat suit. *Id.*

On November 14, 2016, Det. Myers and Det. Carbonaro submitted an Application for Search and Seizure Warrant, which was signed and issued by the Honorable Paul F. Harris, Jr., of the Circuit Court for Anne Arundel County. (Pl.'s Opp'n, Exhibit S — Search and Seizure Warrant, ECF No. 56-20 at 1.) The warrant allowed detectives to search three residences, including the suspected residences of Plaintiff and Aaron Thomas; Plaintiff; Aaron Thomas; and Thomas'

white Nissan.  *Id.*   The warrant also allowed for the seizure of saliva samples from both Plaintiff

and Thomas; and several tangible items found at the locations to be search, including: cellular

phones/electronic devices; clothing; and firearms.  *Id.*    On the same day, an order was issued

allowing investigators to track Plaintiff's cell phone. (Crim Inv. Report at 14.) On November 15,

2016, Det. Myers submitted an Application for Statement of Charges to the Commissioner for the

District Court against Plaintiff for the murder of Briscoe and against Aaron Thomas for firearm

possession by a prohibited person.  *Id.*   With respect to Plaintiff, Det. Myers authored the below

statement of probable cause for the murder of Briscoe:

> Based on witness statements and video surveillance recovered from the area of the crime scene, the suspect was discovered to be a black male subject wearing a grey shirt, grey pants, white shoes and a black face mask. A particular surveillance point revealed the suspect fled the crime scene by utilizing an alley that led away from the crime scene and that the suspect was not with anyone when he fled through the alley.
>
> An eyewitness was interviewed who observed the subject put a black face mask on and then approach the area of Levin Road from the alley where the shooting occurred. The witness believed the subject fired a handgun in the direction of the victim, then ran back through the same alley. The witness observed the subject carrying a handgun in his right hand. The subject ran down the alley past the previously mentioned surveillance point; the subject the witness described was the same person described above.
>
> During the following day, an investigator notice a black male subject wearing identical clothing to the above described subject who was also of the same approximate height and build. The individual quickly evaded the investigator before he could approach the subject; however the investigator learned from a citizen that the person in question was known by the street name, "Pocket." This is a known nickname for the above defendant, Nikko Talley, based on law enforcement intelligence.
>
> Recently, Nikko Talley was interviewed in reference to this incident. Talley advised he was present when Briscoe was shot; however denied shooting Briscoe. Talley identified himself as the person in surveillance wearing the grey shirt, grey pants and white shoes. The witness statement refuted Talley's statement and between the surveillance, witness statement and statement made by Talley; Talley was confirmed to be the person who shot and killed Trayvon Briscoe.

(Defs.' Mot., Exhibit 7-Anne Arundel County Circuit Court Record, ECF No. 49-8 at 4.)   That same day, arrest warrants were issued for both Thomas and Plaintiff Talley.  (Crim. Inv. Report at 14.)  On November 16, 2016, Thomas and Plaintiff were arrested.  *Id.* at 15-16.

Following his arrest, Plaintiff was interviewed for the second time by Det. DiPietro and Det. Harding, and reiterated his previous recollection of the events that transpired on November 4, 2016.  *Id.* at 16.  Talley revealed that he was in Daddy Pa's on November 5, 2016 and saw Det. Carbonaro.  *Id.*  At the conclusion of the second interview, detectives provided Plaintiff with a copy of the arrest warrant charging him with murder.  *Id.*  After reading the arrest warrant, Plaintiff wanted to speak with detectives for a third time to provide additional information.  *Id.*  In his third interview, Plaintiff informed detectives that, when he was walking with Briscoe immediately before the shooting, the individual Plaintiff observed approaching from the vehicle with the black mask was Thomas.  (Crim. Inv. Report at 16.)  Plaintiff also informed detectives that when he ran down the alley, he turned around once he reached the end and watched the incident.  *Id.*  Plaintiff claimed that Thomas had approached Briscoe and pulled out a gun — Briscoe then punched Thomas and Thomas shot Briscoe several times.[1]  On November 17, 2016, following a pretrial detention hearing, Plaintiff was ordered to be held without bond.   (Cir. Ct. R. at 11.)

**Plaintiff's Jury Trial.**

Plaintiff's jury trial began on January 22, 2018.  (Cir. Ct. R. at 56.)  During trial, Plaintiff raised a motion for judgment of acquittal at the close of the State's case, which was denied, as was his renewal of same at the close of all evidence.  *Id.* at 62.  The jury returned a verdict of not guilty

---

[1] On July 13, 2017, the Circuit Court the Anne Arundel County held a hearing on Plaintiff's motion to suppress statements made by him on November 16, 2016 to detectives while in custody.  The Court granted Plaintiff's motion to suppress finding that the Miranda waiver obtained was invalid.  (Cir. Ct. R. at 54.)

on Counts 1 and Count 2 (charging Plaintiff with first-degree murder and use of a firearm in a felony/crime of violence, respectively).  *Id.*

## LEGAL STANDARDS

### MOTION FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.  *Id*. at 249.  Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).  This court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

In undertaking this inquiry, the court considers the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).  The court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir.

2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also*

*Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the

trial court may not make credibility determinations at the summary judgment stage). Indeed, it is

the function of the fact-finder to resolve factual disputes, including issues of witness credibility.

*Tolan v. Cotton*, 134 S. Ct. 1861, 1866-68 (2014).

## ANALYSIS

## I.   COUNT II — § 1983 FOURTEENTH AMENDMENT (MALICIOUS PROSECUTION)

Defendants argue, and Plaintiff does not contest, that the Fourteenth Amendment does not

provide a basis on which Plaintiff may pursue his claim of malicious prosecution. (ECF No 49-1

at. 10; ECF No. 56 at 21 n.1.) *Albright v. Oliver,* 510 U.S. 266 (1994) (holding that the plaintiff

could not seek relief for malicious prosecution based on the substantive due process afforded under

the Fourteenth Amendment of the United States Constitution.) Accordingly, Defendants are

entitled to judgment on Count II.

## II.   COUNTS I, III, AND IV

Counts I, III, and IV are claims of malicious prosecution pursuant to: the Fourth

Amendment under § 1983; the Maryland Declaration of Rights; and state common law,

respectively.[2] With respect to the constitutional malicious prosecution claims (Counts I and III),

Defendants argue that they are entitled to judgment because there was probable cause to initiate

Plaintiff's criminal proceeding (ECF No. 49-1 at 13.) Plaintiff counters that Defendants did not

have probable cause to initiate criminal proceedings against him. (ECF No. 56 at 26.) With respect

---

[2] Maryland law applies to Plaintiff's common law malicious prosecution claim (Count IV). A federal district court considering state common law claims applies the substantive law of the forum state. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). The substantive law of the forum state includes its choice-of-law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). Maryland courts ordinarily apply the tort law of the place where the tort occurred under the doctrine of *lex loci delicti*. *Sherrod v. Achir,* 149 Md. App. 640, 647 (2003). In the present case, the alleged tort occurred in Anne Arundel County, Maryland. Therefore, Maryland law applies.

to the common law malicious prosecution claim (Count IV), Defendants argue that Plaintiff sued the wrong parties because neither Det. DiPietro nor Det. Harding filed the Statement of Charges against Plaintiff.  (ECF No. 49-1 at 12.)  Plaintiff counters that he may maintain a common law malicious prosecution claim against Dets. DiPietro and Harding because they aided and abetted in the criminal prosecution of Plaintiff without "probable cause."  (ECF No. 56 at 21.)

Plaintiff's constitutional malicious process claims are brought pursuant to Articles 24 and 26 of the Maryland Declaration of Rights and the Fourth Amendment of the United States Constitution under § 1983.  It is well established that Article 26 is *in pari materia* with the Fourth Amendment.  *See Richardson v. McGriff*, 361 Md. 437, 452-53 (2000) (explaining "We have long recognized that Article 26 is *in pari materia* with the Fourth Amendment and that decisions of the Supreme Court interpreting the Federal right are entitled to great respect in construing the State counterpart.)  With these principles in mind, "a Fourth Amendment claim for unreasonable seizure requires the plaintiff to show that 'the defendants have seized [plaintiff] pursuant to legal process that was not supported by probable cause and that the criminal proceedings [have] terminated in [plaintiff's] favor.'"  *Spivey v. Norris*, 731 Fed. Appx. 171, 175 (4th Cir. 2018) (quoting *Burrell v. Virginia*, 395 F.3d 508, 514 (4th Cir. 2005)).

With respect to Plaintiff's common law malicious prosecution claim, under Maryland law, "[t]he necessary elements of a case for malicious prosecution of a criminal charge are . . . (a) a criminal proceeding instituted or continued by the defendant against the plaintiff, (b) termination of the proceeding in favor of the accused, (c) absence of probable cause for the proceeding, and (d) 'malice', or a primary purpose in instituting the proceeding other than that of bringing an offender to justice." *Odusami v. Apugo,* 2017 Md. App. LEXIS 1253 *11 (Dec. 18, 2017) (quoting *Exxon Corp. v. Kelly*, 281 Md. 689, 693 (1978)).

10

A.    **Probable Cause**

All of Plaintiff's remaining malicious prosecution claims rise and fall with his probable cause arguments.  To prevail on these claims, Plaintiff must establish that the warrant Det. Myers obtained for his arrest was not supported by probable cause.  *Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012) (to prevail on a malicious prosecution claim "the plaintiff must demonstrate both an unreasonable seizure and a favorable termination of the criminal proceeding flowing from the seizure.")

"Probable cause 'is not a high bar.'" *Dist. Of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)).  "While probable cause requires more than 'bare suspicion,' it requires less than that evidence necessary to convict." *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998).  "'Probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  *Id.*  "Whether probable cause exists in a particular situation . . . always turns on two factors in combination: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992).  Determining probable cause is an objective test.  *United States v. Gray*, 137 F.3d 765, 769 (1998).  The court must "examine the facts within the knowledge of arresting officers to determine whether they provide a probability on which reasonable and prudent persons would act; we do not examine the subjective beliefs of the arresting officers to determine whether they thought that the facts constituted probable cause." *Id.*   The existence or non-existence of probable cause is a mixed question of law and fact.  *Staunton v. Goshorn*, 94 F. 52, 57 (4th Cir. 1899) (explaining "[w]hether or not there is probable cause for the

11

institution of a criminal proceeding is sometimes a question of law and sometimes a question of fact.  Where the facts are undisputed it is a question of law, and should be determined by the court; otherwise, it is one of fact and for the jury."); *Boyd v. Cross*, 35 Md. 194, 197 (1872) (explaining "[a]s to the existence of the facts relied on to constitute the want of probable cause, that is a question for the jury; but what will amount to the want of probable cause in any case, is a question of law for the court.")

It is well settled that, "an indictment, 'fair upon its face,' returned by a 'properly constituted grand jury,' conclusively determines the existence of probable cause."  *Durham*, 690 F.3d at 189 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 117 n.3 (1975)).  However, "a grand jury's decision to indict will not shield a police officer who deliberately supplied misleading information that influenced the decision." *Id.*  "A plaintiff who disputes probable cause despite the issuance of a facially valid indictment must establish that the arresting officer 'deliberately or with a reckless disregard for the truth made material false statements in [the] affidavit' supporting his warrant application, or that he 'omitted from that affidavit material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading.'"  *Jackson v. Carin,* 2022 U.S. Dist. LEXIS 228624 *19 (D. Md. Dec. 19, 2022) (quoting *Miller v. Prince George's Cty., MD*, 475 F.3d 621, 627 (4th Cir. 2001)) (citations and quotation marks omitted).  "Such reckless disregard is established when, considering all the evidence, 'the affiant must have entertained serious doubts as to the truth of his statements or had obvious reason to doubt the accuracy of the information he reported.'" *Id.* (quoting *Miller*, 475 F.3d at 627) (citations and quotation marks omitted).  "With respect to any alleged factual omissions, the plaintiff must show that 'a police officer failed to inform the judicial officer' who issued the warrant 'of facts that he knew would negate probable cause.'" *Id.* (quoting *Miller*, 475 F.3d at 627) (citations and quotation

marks omitted).  "Such false statements or omissions are 'material' if correcting the false statements and including the omitted facts would have defeated probable cause."  *Id.* (quoting *Miller*, 475 F.3d at 627) (citations and quotation marks omitted).

Here, an indictment (Cir. Ct. Record at 13) was returned charging Plaintiff with murder, which "conclusively determines the existence of probable cause."  *Durham*, 690 F.3d at 189. Accordingly, to prevail on his malicious prosecution claims, Plaintiff must demonstrate that the established probable cause is negated by Det. Myers' omission of material facts.   Plaintiff identifies what he contends are "material deficiencies" in the arrest warrant that negate probable cause.  The court addresses each below and, in so doing, is guided by the United States Supreme Court's opinion in *Brinegar v. United States*:

> In dealing with probable cause, however, as the very name implies, we deal with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

338 U.S. 160, 175 (1949).

> 1.   *Asserted Deficiency No. 1*

"William Barrett, Terry Strother, Daniel Rasinski or Scott Smoot, who were all interviewed by officers" are not mentioned in the arrest application.  (ECF No. 56 at 27.)

**Record Evidence**: Scott Smoot spoke with Ofc. M. Latta on the night of Briscoe's Murder and advised Ofc. Latta that he observed a white Nissan Versa and a Red Jeep Liberty, and two men standing between the two vehicles.  (Pl.'s Opp'n., Exhibit D—Ofc. M. Latta Report, 56-5.) Smoot advised the officer he went to go watch television and a short time later heard a "pop, pop, pop" — which he thought sounded like gunshots. *Id.*  Smoot went back to the window and saw the two vehicles driving away and the two males running away.  *Id.*  Smoot could not provide any description of the two males he saw or the vin number for the vehicles.  *Id.*

Rasinksi told officers he heard "three pops" – then, seconds later, another pop; he then heard a vehicle speed away. (Pl.'s Opp'n., Exhibit E—Ofc. E. Sasser Report, 56-6 at 3.) Strother told officers he observed a black male wearing a long sleeve grey or white shirt or sweatshirt running down from the alley with an illuminated cell phone. *Id.* at 4.

During the neighborhood canvass on November 5, 2016 — the day after Briscoe's murder, investigators spoke with Barrett. Barrett advised investigators that he did not personally witness the shooting, but heard details about the incident from other people. Barrett advised investigators that he could not personally attest to the accuracy of any information. (Crim. Inv. Report at 9.)

**Court Analysis:** The undisputed evidence does not support a finding that this "omission" is material. First, the mere fact that the arrest application does not mention who was interviewed is not material. The identity of interviewees is not relevant to whether there was probable cause to arrest Plaintiff for murder. With respect to the substantive information officers obtained from interviewees, such information does not negate facts set forth in the arrest application. Indeed, some of the information provided is consistent with the arrest application, such as the color of the shirt worn by the person running down the alley (grey). Additionally, it is unsurprising that information provided by Barrett was not included in the warrant application; by his own admission, he could not verify the accuracy of the information he provided.

That people heard a vehicle speed away does not negate the facts set forth in the arrest application that Plaintiff identified himself on the surveillance tape running down the alley following the shooting of Briscoe, or that Fisher told officers he saw Plaintiff holding a handgun while running down the alley.

2.    *Asserted Deficiency No. 2*

"Aaron Thomas, Alec Joseph Conley, Arnell Johnson, or any other person who had been implicated for their possible involvement" were omitted from the arrest application.  (ECF No. 56 at 27.)

**Record Evidence:** Barrett provided officers with the names "Conley, Coxson, Gilley, and Aaron" and indicated they were associated with the Bloods gang in the community. (Crim. Inv. Report at 9.)  Several search warrants for cell phone records and access to social media were issued for several individuals, including those named by Plaintiff.  The search warrants as issued were based on information provided to investigators that the named individuals were associates who were with the shooter prior to Briscoe's murder, and that they were associated with the Bloods gang.

(Verizon Search Warrant, ECF No. 56-14; Sprint Search Warrant, ECF No. 56-15; Snapchat Search Warrant, ECF No. 56-16; Facebook Search Warrant, ECF No. 56-17; Crim Inv. Report at 19-20.)

**Court Analysis:** This "omission" does not negate the probable cause for Plaintiff's arrest. Officers received information that Plaintiff was associated with members of the Bloods gang and investigated those individuals.  The arrest application states: "Investigation revealed Briscoe was previously the target of violent incidents by associates of Talley and this incident appears to be the culmination of these incidents." (Cir. Ct. Record at 4.)  The fact that the arrest application does not expressly identify every individual who was suspected of, believed to be involved in, the crime does not destroy probable cause.

Det. Myers was required to demonstrate facts supporting a reasonable belief that Plaintiff committed the crime of murder.  Det. Myers was not required to eliminate all (possible) suspects

before submitting an arrest application for one suspect – in this instance, Plaintiff.  The burden Plaintiff places on Det. Myers is too high – higher than the law imposes.  Plaintiff's position sounds in reasonable doubt not probable cause.  Stated differently, when he filed the arrest application, Det. Myers was not required to state facts showing no reasonable doubt that Plaintiff committed murder.  Had Det. Myers included the asserted omissions, such information would not have diminished the facts set forth in the arrest application supporting a reasonable belief that Plaintiff committed the crimes, which is to say probable cause would not have been negated.

       3.    *Asserted Deficiency No. 3*

"Crystal Wright, Ms. Cochran, or Nikole Sullivan, who all contacted 911 seeking to provide vital exculpatory information but who the officers never bothered to contact."  (ECF No. 56 at 27.)

**Record Evidence:** During Plaintiff's criminal trial, the referenced 911 calls were played in open court.

When Cochran called 911, she told the dispatcher:

> DISPATCHER: (Indiscernible - 10:03:24)
>
> MS. COCHRAN: Yes, ma'am. I just called a little bit ago about shots fired on Levin and (indiscernible -10:03:35).
>
> DISPATCHER: Where and when?
>
> MS. COCHRAN: On Levin and (indiscernible -10:03:40) I made a call maybe an hour ago about the shots – I was just driving down Levin to cut up to go to the little – store. There were three guys walking with face masks on and as I get to the stop sign I heard three more shots fired.

(Jan. 29, 2018, Trial Tr. 11:16-12:1.)

> DISPATCHER: Did you see any weapons?

MS. COCHRAN: No, I didn't see no weapons. I just seen some black guys with masks.

*Id.* at 12:5-7.

DISPATCHER: How many shots did you hear?

MS. COCHRAN: Three.

DISPATCHER: Which direction were they walking in?

MS. COCHRAN: Down Levin and two of them were walking – walking towards my house.

DISPATCHER: Okay. Can you tell me what they were wearing? What clothes – what color their jackets were?

MS. COCHRAN: One of them had on a old black tee with white stripes – the other one had on a black hoodie and some dark jeans. And the other guy, I couldn't see what he was wearing because he was kind of behind the cars. I just seen him with a face mask.

*Id.* at 12:22-13:8.

Crystal Wright also called 911:

DISPATCHER: Anne Arundel County Police, how may I help you?

MS. WRIGHT: Hi, this is Crystal Wright –

DISPATCHER: Ma'am?

MS. WRIGHT: Yes, I'm here. Yeah, I just saw the shooting over there on Levin.

DISPATCHER: You saw what, ma'am?

MS. WRIGHT: You just had a shooting over there on Levin.

*Id.* at 13:22-14:5

DISPATCHER: And what type of information do you have?

MS. WRIGHT: The vehicles that have been in the area. The vehicle that sped off when the shooting was done. And the people that were in those vehicles, what house they go to on the block.

17

DISPATCHER: Okay.

MS. WRIGHT: I didn't actually see the shooting, but I know who's involved with the shooting.

*Id.* 15:9-17.

Nikole Sullivan dialed 911 and stated:

MS. SULLIVAN: I'm calling because I just heard three (indiscernible) shots by a Glick III gunshot behind my house.

(Jan. 26, 2018, Trial Tr. 66:14-20.)

THE OPERATOR: Okay. And did you see anything or you just heard it?

MS. SULLIVAN: Oh, I just heard it and I just watched a guy. He's parked right next to my house. He came running down the back alley with a black mask. He's a black man dressed in a black mask, black hoodie. Jumped in the passenger seat and they took off.

*Id.* at 66:14-20.

THE OPERATOR: And what kind of vehicle was it? A black vehicle?

MR. SULLIVAN: No, no. My fiancé says it was white. And he said it was a Nissan Versa, it looked like. And it looked like a newer car.

THE OPERATOR: Okay.

MS. SULLIVAN: They paid some man driving it. The guy that was driving was not the shooter.

*Id.* at 67:14-21.

THE OPERATOR: Okay. And there were at least two people in the vehicle?

MS. SULLIVAN: Okay. Yeah. There's at least two people. My house is right on the corner of Edgevale and Levin. I'm a single-family home. They were right behind my house in the alley because I'm getting my son (indiscernible 11 – 11:39:09) looking out to watch – heard the gunshots out the window. Looked out the window. He came running down the alley, jumped in the white Nissan Versa that was parked right next to my car. And he's in a black mask with

18

a black hoodie over his head and it's a black man. I couldn't see
what kind of – who was driving 'cause it's dark. But somebody else
was driving.

*Id.* at 68:5-17.

**Court Analysis:** The court understands Plaintiff to argue that Det. Myers should have
included in the arrest application that he did not contact certain witnesses who called 911.
Plaintiff's argument raises issues with how the investigation was conducted; not with what
information is contained in the arrest application.  Taking it a step further – and construing
Plaintiff's argument to contend that had officers contacted the 911 callers, officers would have
discovered information that would negate probable cause, the argument is unpersuasive.  The
information provided by the 911 callers is not inconsistent with the information set forth in the
arrest application; it does not impair or erode the reasonableness of an officer's belief that Plaintiff
committed the crime being investigated.  Inclusion of the 911 calls in the arrest application would
not, therefore, have materially affected the existence of probable cause, or the court's finding of
same.

### 4.    *Asserted Deficiency No. 4*

Plaintiff asserts that failure to mention "the white Nissan" in the arrest application is a
material omission.  (ECF No. 56 at 27.)

**Record Evidence:** A search warrant was issued for Aaron Thomas' 2011 white Nissan
Sentra.   During the search of the Nissan, detectives recovered a black face mask, cell phone,
McDonald's receipt and a M&T bank receipt.  (Crim. Inv. Report at 15.)

**Court Analysis:** The undisputed evidence regarding the white Nissan does not support a
finding that that Defendants lacked probable cause to arrest, and later charge, Plaintiff.  The arrest
application mentions that witnesses reported Plaintiff had on a black mask when he was observed

running down the alley.  That a black face mask was recovered from Thomas' vehicle has no bearing on whether Plaintiff donned a black face mask at the crime scene.  Probable cause to believe Plaintiff committed the crime is not negated because the arrest application does not mention the white Nissan or the contents seized from therein.

5.    *Asserted Deficiency No. 5*

Plaintiff argues that the arrest application does not indicate "that Mr. Fisher's statement about what Mr. Talley was allegedly holding was directly contradicted by Mr. Strother's."  (ECF No. 56 at 27.)  The record evidence related to this point is set forth above addressing Plaintiff's Asserted Deficiency No. 1.

**Court Analysis:** This information amounts to contradictory evidence uncovered during the investigation.  One eyewitness claims he saw Plaintiff holding a gun and the other claims he saw Plaintiff holding a cell phone.  This comes down to witness credibility to be tested at trial, and surely provides fertile ground for development of reasonable doubt.  That eyewitness statements are inconsistent, however, does not defeat probable cause, which is to say that contradictory eye-witness statements do not, when considered against the backdrop of all information then having been gathered, negate a reasonable belief that Plaintiff committed the crime.  When Det. Myers submitted the arrest application, based on the evidence then developed and assuming one eye-witness was correct, it was equally probable that Plaintiff was holding a handgun or a cell phone while running down the alley.

6.    *Asserted Deficiency No. 6*

Plaintiff asserts the arrest application omitted "that Mr. Barrett and Ms. Sullivan identified the shooter as a person that got out of Mr. Thomas' vehicle."  (ECF No. 56 at 27.)  The record

evidence relevant to this asserted deficiency is set forth above relating to Asserted Deficiency Nos. 1 and 3.

**Court Analysis:** The evidence in the record does not support a finding that either Barrett or Sullivan identified the shooter as a person who got out of the car. As discussed earlier, Barrett could not vouch for the accuracy of the information he provided to police because he learned of the details from other people in the neighborhood. Additionally, Sullivan never identified the shooter as a person that got out of a vehicle. To the contrary, during Sullivan's 911 call, she indicated that she did not see the shooting or the shooter, but rather heard gunshots, and observed someone trying to get into a white Nissan being driven by a second individual. Because there is no evidence that either Sullivan or Barrett observed the shooter get out of the vehicle, Det. Myers would have no reason to include such information in the arrest application. Probable cause remains intact.

### 7.     *Asserted Deficiency No. 7*

Plaintiff argues the arrest application omitted to mention "that Mr. Barrett reported that he was threatened by Mr. Thomas with a gun because of his report." (ECF No. 56 at 27.)

**Record Evidence:** On November 12, 2016, Barrett contacted Det. Carbonaro to report that Thomas had threatened him with a firearm. (Crim. Inv. Report at 13.) Barrett said he made a comment to Thomas about the murder and Thomas responded by threatening Barrett's son's safety by lifting his shirt to reveal a handgun and cautioning Barrett's son that he had better stop discussing the murder on social media. *Id.* Barrett also advised he saw Thomas drive away in a white Nissan Sentra. *Id.*

**Court Analysis:** Thomas was arrested in connection with his interaction with Barrett. That notwithstanding, the omission of the incident from the warrant application does not destroy or

21

negate probable cause.  There is no evidence that Plaintiff was involved with the November 12, 2016, incident; and, in any event, the incident is not inconsistent with the information in the arrest application.

        *8.     Asserted Deficiency No. 8*

Plaintiff argues that the arrest application does not mention "the surveillance footage that confirmed the white Nissan was near the scene on the north side a few minutes prior to the shooting, opposite of the direction Talley ran."  (ECF No. 56 at 27.)

**Record Evidence:** Video surveillance from a fixed camera recorded a white passenger vehicle consistent with a Nissan Altima proceed to the area of the crime scene a few minutes before the murder of Briscoe.  (Crim. Inv. Report at 11-12.)

**Court Analysis:** As set forth above, omission to mention the white Nissan does not negate established probable cause.  Had the arrest application included mention of the white Nissan, other facts contained therein would not have been contradicted or negated; rather, it would merely have added to the totality of the surrounding factual context or circumstances.

        *9.     Asserted Deficiency No. 9*

Plaintiff argues that the arrest application does not include "that there is no evidence Mr. Talley was a member of the Bloods gang"

**Record Evidence:** Briscoe had former conflicts with individuals associated with the Bloods gang.  (Crim Inv. Report at 7.)  Briscoe's associates believed his murder may have been a result of the ongoing conflict.  *Id.* at 8.

**Court Analysis:** There is nothing in the arrest application that indicates that Plaintiff was a member of the Bloods gang.  Indeed, the Bloods gang is not mentioned at all.  Probable cause is not negated because the arrest application does state that Plaintiff is not a Bloods gang member.

10. *Asserted Deficiency No. 10*

Plaintiff argues that the arrest application fails to mention "that the only firearm found in the numerous searches conducted was in the possession of Mr. Thomas." (ECF No. 56 at 27.)

**Record Evidence:** The projectiles recovered at the scene of the crime were found to be consistent with a .380 automatic caliber and fired from the same gun. (Crim. Inv. Report at 11.) During the search of Thomas' bedroom, detectives found and seized a loaded .357 Taurus revolver. *Id.* at 14.

**Court Analysis:** Although the undisputed evidence demonstrates that a gun was seized from Thomas' home, it is also undisputed that the gun that killed Briscoe and Thomas' gun are not the same caliber weapon. That a gun (not matching the murder weapon) was recovered from Thomas' bedroom does not negate anything in the arrest application. The arrest application with respect to Plaintiff was for murder and the gun seized from Thomas' bedroom did not fire the projectiles recovered from the scene (or, at the very least, the gun seized from Thomas' bedroom does not fire .380 caliber ammunition).

11. *Asserted Deficiency No. 11*

The arrest application does not state "that the Defendants failed to find any evidence at all that Mr. Talley ever owned or possessed a gun on November 4, 2016, much less used one." (ECF No. 56 at 27.)

**Court Analysis:** Again, Plaintiff's argument properly attacks the investigation, but not the arrest application. The arrest application states that a witness believed Plaintiff fired a handgun in the direction of the victim and observed Plaintiff holding a handgun. This is the evidence that Det. Myers had when he filled out the arrest application. The fact that Defendants did not have more evidence at the time does not negate probable cause; the law of probable cause does not require an

officer to suggest to a reviewing judge possible explanations or arguments that might favor the suspect's defense.

### 12.    Asserted Deficiency No. 12

Plaintiff asserts that the arrest application does not mention "that the only black face-mask found linked to any relevant individual was confirmed to have been used by Mr. Thomas." (ECF No. 56 at 27.) *See* Record Evidence and Court Analysis at Asserted Deficiency No. 4, above.

### 13.    Asserted Deficiency No. 13

Plaintiff argues that the arrest application does not mention "the Defendants' interview of Kyrom Burris — the only witness ever interviewed who witnessed the shooting and corroborated Mr. Talley's version of events," and Defendants should have amended the arrest application to include this information. (ECF No. 56 at 27-28.)

**Record Evidence:** On November 22, 2016 — six days after Plaintiff was arrested, Kyrom Burris was interviewed by Dets. Harding and Myers. (Crim. Inv. Report at 17.) Burris informed detectives that, right before the shooting, he was walking with Briscoe, Plaintiff, and another individual—Johnny. Burris reported that Plaintiff suddenly said to run away; then Plaintiff started running down the alley. *Id.* Burris advised that, although he was looking at his phone, he saw a man dressed in all black wearing a black mask walk past him and Johnny. According to Burris, at some point, he (Burris) noticed that Johnny had run away; and Burris went to watch what was going to happen. Burris advised that he observed the male with the black mask walk up to Briscoe and pull out a handgun; Briscoe punched the man and the man then shot Briscoe several times before Briscoe ran down an alley. *Id.* Burris further detailed that he saw the subject approach a white car; once the car drove away, Burris walked around the neighborhood to avoid the suspect. *Id.* Det. Myers noted several inconsistencies with Burris' recollection of events. Video

surveillance contradicted that Burris had watched the shooting alone and then walked around the neighborhood looking for Briscoe. *Id.*

**Court Analysis:** Importantly, Det. Myers did not learn information offered by Burris until after he submitted the arrest warrant application. Therefore, he did not omit the subject information from the arrest application. Additionally, Plaintiff did not detail his "version of events" until after he was arrested and reviewed the charging papers. It was then that Plaintiff offered his version of events. Probable cause is not destroyed by information unknown to the affiant at the time of the warrant application.

***

In summary, the court finds that, under the totality of the circumstances, none of the omissions identified by Plaintiff are material. Therefore, the probable cause conclusively established by return of the indictment against Plaintiff remains intact. Plaintiff's identified omissions may collectively amount to reasonable doubt; they do not negate probable cause. Because the court finds that the arrest warrant was supported by probable cause, Plaintiff's common law and constitutional malicious prosecution claims fail, and Defendants are entitled to judgment on Plaintiff's remaining claims.

**B.** **Qualified Immunity**

Defendants argue that Cpl. DiPietro and Sgt. Harding are protected from state and federal claims by qualified immunity. (ECF No. 49-1 at 11.) "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Dist. Of Columbia. V. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Because the court finds that the arrest warrant was supported by probable cause, no Fourth Amendment

violation has occurred.  Accordingly, Defendants Harding and DiPietro are entitled to qualified immunity.  *See Spivey v. Norris,* 731 Fed. Appx. 171, 175 (4th Cir. 2018) (noting "if probable cause existed such that there was no Fourth Amendment violation, [the officer] would be entitled to qualified immunity on the claim against him in his individual capacity.")

## CONCLUSION

Because the court finds the arrest warrant was supported by probable cause and Cpl. DiPietro and Sgt. Harding are entitled to qualified immunity, the court declines to address Defendants' arguments that Plaintiff sued the wrong defendants.

For the reasons set forth herein, by accompanying order, the Motion is granted and judgment shall be entered in favor of Defendants.


                                            _____/s/_____

                                            Julie R. Rubin
                                            United States District Judge